**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DEMETRIUS MINOR,

                Plaintiff,

                v.

SGT. DAVID DILKS, et al.,

                Defendants.

Civil Action No. 19-18261 (KMW) (AMD)

**OPINION**

**WILLIAMS**, District Judge:

This matter comes before the Court on the Defendants' motions for summary judgment. (ECF Nos. 167-168.) Plaintiff filed a response to the motions (ECF No. 174), to which Defendants replied. (ECF Nos. 177-178.) For the following reasons Defendants motions for summary judgment shall be granted in part and denied in part.

## I.    BACKGROUND

Plaintiff is a male who self identifies as a "transgender woman" who is currently serving a lengthy sentence for carjacking and manslaughter charges in the New Jersey prison system. (*See* ECF No. 83 at 1; ECF No. 170 at 3.) Plaintiff's operative amended complaint generally concerns Plaintiff's incarceration in South Woods State Prison in 2020 following Plaintiff's diagnosis with gender dysphoria. (ECF No. 88 at 4.) In the operative complaint, Plaintiff alleges three sets of claims. First, Plaintiff alleges that Defendants Powell, Solanik, Dilks, and Weinstein discriminated against Plaintiff in violation of 42 U.S.C. § 1983, the NJCRA, and the NJLAD by moving Plaintiff

into cells with prisoners likely to be intolerant of Plaintiff's expressed identity and thereafter refusing to transfer Plaintiff despite the risk of potential violence Plaintiff faced as a result of these placements, and that Defendant Young also discriminated against Plaintiff by allegedly opening Plaintiff's cell to permit another inmate to attack Plaintiff. (*Id.* at 5-7.) Second, Plaintiff alleges that his placements, the alleged cell attack incident, and an alleged incident in which Dilks and Young "disclosed Plaintiff's gender identity to other inmates" and thereby increasing the likelihood of an attack were made in retaliation for Plaintiff filing various grievances, complaints, and advocacy documents on behalf of Plaintiff and other "LGBTQ+" inmates in violation of the First Amendment for which Defendants are liable under § 1983 and the NJCRA. (*Id.* at 7-9.) Finally, Plaintiff alleges that the events discussed above also amount to cruel and unusual punishment in violation of the 8th Amendment for which Defendants are liable under § 1983 and the NJCRA. (*Id.* at 9-10.) Defendants now move for summary judgment as to all of these claims.

Plaintiff was in South Woods prison between 2017 and August of 2020.[1] (ECF No. 168-3 at 5.) In 2020, Plaintiff was formally diagnosed with gender identity disorder and prescribed cross-sex hormones, after which Plaintiff formally informed the NJDOC of the diagnosis. (*Id.* at 8-10.) Plaintiff thereafter informed Defendant Solanik, who Plaintiff identified as the prison's PREA coordinator, of Plaintiff's diagnosis and identity, as well as some alleged mistreatment by prison staff following Plaintiff's "coming out" to prison staff. (*Id.* at 13.) Plaintiff also testified that Solanik received several of Plaintiff's administrative grievances regarding alleged mistreatment by other inmates and prison staff. (*Id.*) Plaintiff also testified that Solanik told him that he would

---

[1] Plaintiff's testimony during Plaintiff's deposition was given in a stream of consciousness manner. Plaintiff's responses to various questions contained numerous cross references to alleged incidents which are not described in great detail, and Plaintiff rarely gave clear dates for the events which occurred while at South Woods. It is not always abundantly clear to what events Plaintiff is referring in some of Plaintiff's testimony. This Court in this opinion has endeavored to focus on the events which Plaintiff does clearly allege are part of this matter.

not be transferred to a different unit unless and until an actual incident occurred showing a clear threat to Plaintiff's safety. (*Id.* at 16.)

According to Plaintiff, the gender identity issue came to a head initially while he was housed in South Woods' unit one. (*Id.* at 14-15.) Plaintiff testified that, while in the law library, Defendant Dilks "came into the library" and called Plaintiff a "faggot" and that such individuals "like to touch each other" in front of other inmates, causing Plaintiff embarrassment and humiliation. (*Id.*)

Following this incident, in August 2019, Plaintiff testified that Plaintiff asked guards to file a PREA complaint against Dilks. (*Id.* at 18.) Plaintiff alleges Plaintiff was not permitted to do so, so when Plaintiff went back to Plaintiff's cell and made a sign saying that Plaintiff wanted to file a PREA complaint which Plaintiff held up to the cell door for cameras to record. (*Id.* at 21.) During his deposition Plaintiff testified that a number of guards came, handcuffed Plaintiff, and took Plaintiff to a holding cell. (*Id.*) For the first time in Plaintiff's deposition, Plaintiff testified, with little elaboration that "they," presumably some of the guards who moved Plaintiff "raped [Plaintiff] and [Plaintiff] urinated on [Plaintiff]." *Id.* Plaintiff had previously filed a number of prison grievances about these events, and in this matter alone filed numerous complaints, none of which contained any allegation that guards raped Plaintiff. (*See* ECF Nos. 1 at 25-28; ECF No. 33 at 14-15; ECF No. 43 at 44; ECF No. 88 at 5-10; ECF No. 168-8 at 6, 8.) In prior grievances, Plaintiff had stated only that guards placed Plaintiff in a holding cell with a locked toilet where he remained for an hour before being seen by medical staff and a total of five hours before being seen by investigators from the prison's Special Investigations Division (SID), which is responsible for PREA investigations. Plaintiff's complaints in this matter also uniformly contain allegations from Plaintiff that Plaintiff was moved to the holding cell, remained there with a visit from medical after an hour, and during the remaining four hours of waiting could not use the restroom and Plaintiff

eventually slightly urinated in Plaintiff's clothes. (*Id.*) Plaintiff's deposition testimony, undetailed as it is, was thus contrary to the claims raised in Plaintiff's inmate grievances and in every complaint Plaintiff filed in this matter to the extent Plaintiff stated that someone unspecified person raped Plaintiff. As a plaintiff may not amend his complaint through a deposition or a response to a dispositive motion, as Plaintiff never amended the operative complaint to assert a claim based on an alleged rape, as Plaintiff provided no details as to the alleged undescribed rape by persons unknown, and as any claim premised on a rape would not be exhausted as Plaintiff never asserted a rape in any prison grievance, this Court does not consider Plaintiff's bald assertion of an unspecified rape, never mentioned prior to the deposition, in deciding this motion. *See Save Long Beach Island v. U.S. Dep't of Comm.*, 721 F. Supp. 3d 317, 335 (D.N.J. 2024) (plaintiff may not amend a complaint through a response to a dispositive motion); *see also Woodford v. Ngo*, 548 U.S. 81, 84-85 (2006) (plaintiff cannot pursue a civil rights claim related to prison conditions without first exhausting all administrative remedies); *E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (sexual assault by prison staff is a separate, stand-alone constitutional violation); *Laurie v. Nat'l Passenger RR. Corp.*, 105 F. App'x 387, 392-93 (3d Cir. 2004) (plaintiff cannot amend a complaint after the close of discovery or in a response to a summary judgment motion).

Plaintiff testified that after spending several hours in the holding cell, Dilks asked Plaintiff if Plaintiff still wished to file his PREA complaint, which Plaintiff stated he did, and Dilks told Plaintiff that staff were moving Plaintiff to a new cell. (ECF No. 168-3 at 21.) When Plaintiff was moved to the new cell, Plaintiff was unhappy because the new cellmate was a large man with many tattoos who Plaintiff believed was a gang member. (*Id.*) Plaintiff further testified that Plaintiff believes Dilks was the prison's "gang sergeant" and had purposefully placed Plaintiff in a cell with this individual. (*Id.* at 22.) Prison staff initially refused to move Plaintiff following Plaintiff's complaints, but Plaintiff eventually filed further PREA complaints against Dilks, and

was moved to a new cell by SID staff. (*Id.*) Plaintiff testified that this inmate later struck Plaintiff when they were alone, and guard staff other than Defendants did not permit Plaintiff to report the incident to medical.[2] (*Id.* at 23.)

In his deposition, Plaintiff contends that much of the treatment Plaintiff received was in response to LGBT advocacy in which Plaintiff engaged after a friend was killed. (*Id.* at 24.) This appears to reference an incident which occurred in which an inmate named Kayon Wade was killed by his cellmate in December 2019. (*See, e.g.,* ECF No. 168-8 at 21; ECF No. 168-3 at 24.) Plaintiff thereafter began filing requests for policy changes, and petitioning politicians for change. (ECF No. 168-3 at 24.) Although Plaintiff testified Weinstein and Dilks moved Plaintiff after these advocacy efforts, the dates to which he refers for the alleged moves were in the months *prior* to December 2019. (*Id.* at 25.) Plaintiff testified that when he discussed things with Dilks and Weinstein after Plaintiff's advocacy, though, Plaintiff was told that he would face fewer transfers and intrusions if he stopped filing repeated grievances and requests. (*Id.*) Plaintiff testified that eventually a number of inmates protested leaving their cells because of Plaintiff, Plaintiff was moved to the prison's facility two, allegedly by Defendant Powell. (*Id.* at 26-27.) In early February 2020, Plaintiff requested to be moved to a woman's facility. (ECF No. 168-9 at 2.) Plaintiff was then offered to be transferred to a women's prison in early 2020, but Plaintiff decided against the move at that time and refused. (ECF No. 168-3 at 38.) Plaintiff once again sought

---

[2] Plaintiff's prison grievances paint a somewhat different story. Although Plaintiff on numerous occasions requested cell changes and demanded to be housed with other LGBT inmates, his grievances did not ever allege being attacked or otherwise harmed by his cellmate. Even when provided opportunity to explain why his current assignment was unsafe, Plaintiff failed to provide staff with specific details alleging violence or threats from his cell mate. (*See* ECF No. 168-8 at 1-21.) Indeed, as noted in Plaintiff's grievances, Plaintiff told a case worker and medical staff in September 2019 on two occasions that he felt safe in his assignment and was not in distress. (*See id.* at 12.) Plaintiff was thereafter moved a few times, and attempted to request a specific cell mate, which was not permitted under the facility's rules. (*Id.* at 14-19.)

transfer in the summer of 2020 and was ultimately approved for a transfer to Edna Mahan on August 20, 2020.  (*Id.*; ECF No. 168-9 at 2-3.)

Plaintiff testified that upon arrival in his new unit in early 2020, Plaintiff had issues with Defendant Young.  (ECF No. 168-3 at 28.)  Plaintiff alleges she made statements suggesting she wanted other inmates to get Plaintiff off of her unit because another inmate allegedly told her Plaintiff had written complaints about her.  (*Id.* at 28, 33.)  Plaintiff alleges that Young ordered her inmate workers to attack Plaintiff and that she called to have Plaintiff's cell door opened so that they could enter, resulting in an inmate named Cream entering Plaintiff's cell, striking him in the mouth, and cracking his tooth.  (*Id.*)  Plaintiff was shortly thereafter removed from that unit while SID investigated the issue.  (*Id.* at 29.)  Plaintiff stated that these two incidents were the only real issues Plaintiff had with Young.  (*Id.* at 33.)  Plaintiff did suggest, however, that Young may have used homophobic language towards Plaintiff on occasion.  (*Id.* at 35.)  Plaintiff clarified that none of the named Defendants ever physically harmed Plaintiff, however.  (*Id.* at 37.)

Because of the SID investigation, there is a record surrounding the Cream attack incident, including video footage SID reports, and SID video interviews.  This incident occurred on May 26, 2020.  (*See* ECF No. 168-11 at 5.)  Having reviewed the videos, the Court summarizes their perspective on these events as follows.  The actual video footage of the incident is from an overhead angle which views Plaintiff's entire unit during a recreation period where Plaintiff's group of inmates were allowed out of their cells.  Two other inmates, runners who performed odd jobs for Young one of whom was Cream, were also out of their cells.  During the entire length of the video, Defendant Young remains seated, watching over the unit near her other runner, who it appears was conversing with her.  While so seated, Plaintiff and Cream enter the video frame, having what appears to be a verbal argument of some sort perhaps twenty feet from where Young is seated.  After this argument, they separate, with Plaintiff going up a set of stairs back to his cell.

Once Plaintiff walks down the upper floor's hall toward his cell, Plaintiff is no longer visible. A short while later, Cream goes up the same stairs and walks in the same direction towards where Plaintiff's cell is located.[3] He also ceases to be visible to the camera at that point. After a couple of minutes, Cream returns from that area, and walks back down the stairs to the lower level. At no point during these events did Defendant Young call to have Plaintiff's cell opened. During interviews with SID, Young acknowledged that inmates were not allowed into areas away from their cells such as Plaintiff's cell area, but stated that her runners sometimes went on her behalf to help with inmate complaints or when inmates needed help and she was otherwise engaged overseeing things. Young claimed not to recall or know why Cream had went upstairs, but during his interview Cream stated that he went there to retrieve legal paperwork which Plaintiff possessed and was working on for him. Plaintiff did not report the assault until the following day. (See id. at 5.) When reviewed by medical staff, Plaintiff was found to have a swelling of his upper lip, and to have tooth pain resulting from a "slightly chipped" tooth. (Id. at 9.)

After the Cream incident, Plaintiff was moved once again to a different facility in South Woods, where Plaintiff remained until being transferred to Edna Mahan. (ECF No. 168-3 at 30.) Plaintiff remained at the Edna Mahan facility until Plaintiff impregnated another inmate at the facility, at which point Plaintiff was transferred to a men's youth facility, and then to Northern State Prison. (Id. at 31-32.)

---

[3] The SID report indicates that they view the video as showing Plaintiff entering his cell, and Cream thereafter entering the same cell when he gets to the area. While it does appear clear that this is what happened given Plaintiff's injuries and statements Cream later made on a recorded phone call, it is by no means clear from the video that this occurred. SID staff also concluded that Young looked in that general direction while Cream was headed towards Plaintiff, but it is by no means clear from the video that she was actually looking in that direction, or that she could see where exactly Cream had gone from her vantage position after he walked down the upper floor hallway. (See ECF No. 168-11 at 5.)

In his deposition, Defendant Dilks largely disputes Plaintiff's version of events. Dilks testified that he was not involved in any placement or classification decisions for Plaintiff, and was uninvolved in any housing assignments for Plaintiff. (ECF No. 168-4 at 10, 24.) Dilks denied referring to Plaintiff by any gendered terms, instead referring to Plaintiff by surname. (*Id.* at 11.) Dilks also denied disclosing Plaintiff's sexuality or gender identity to third parties. (*Id.*) Dilks testified that although he likely learned Plaintiff identified as transgender at some point prior to Plaintiff's transfer out of South Woods, he did not recall ever specifically discussing the issue with Plaintiff, did not recall knowing or discussing Plaintiff's sexuality, did not tell any inmate that Plaintiff was gay or transgender, did not mistreat Plaintiff because of Plaintiff's sexuality or gender identity, and did not recall any knowledge of Plaintiff advocating for LGBT causes or filing grievances for or on behalf of other inmates. (*Id.* at 16, 19.) Dilks did recall, however, that Plaintiff filed several complaints about him. (*Id.* at 17.) Dilks further denied any knowledge of Plaintiff attempting and being prevented from filing a PREA complaint. (*Id.* at 18.) As to the PREA sign incident, Dilks testified that he was called after Plaintiff had held up the sign and been escorted off his unit pursuant to standard procedures, but was not involved in that process. (*Id.* at 18-19.) Although he was not involved in escorting Plaintiff off of his unit, Dilks further opined that although multiple officers may respond to requests for help, fifteen to twenty officers would not be used to escort a prisoner out of his unit to make a PREA complaint. (*Id.* at 21.) Dilks testified that typically that many officers would not even be available, and standard practice was for only a couple of officers and a supervisor to provide such escorts. (*Id.*) Dilks further testified that while it was not usual for an inmate to be left for several hours in a holding cell in such a situation, any inmate seeking to make a PREA complaint would be held separately under supervision until SID arrived to take their report. (*Id.* at 21-22.) Dilks flatly denied ever calling Plaintiff a slur or making

other comments about Plaintiff, and denied ever mistreating or taking any retaliatory action against Plaintiff for making grievances, reports, or otherwise engaging in advocacy. (*Id.* at 22.)

At his deposition, Defendant Weinstein stated that, during the between June 2019 and August 2022, he was a lieutenant at South Woods to whom Defendant Dilks reported. (ECF No. 168-5.) Weinstein testified that his first interaction he could recall with Plaintiff was the incident involving the PREA complaint sign. (*Id.*) Weinstein testified that, when Plaintiff's housing arrangements were determined, he and his staff gave serious consideration to Plaintiff's views regarding the safety of housing assignments, and that arrangements were made such that persons such as Plaintiff were not placed with anyone considered to be a sexual predator. (*Id.* at 9.) Weinstein testified that he recalled Plaintiff requesting a transfer, and that he spoke with Plaintiff but was told that Plaintiff did not have any specific issue with Plaintiff's cell mate and thus concluded that there was no basis at that time to move Plaintiff as the facility was constantly subject to hundreds of such requests which could not all be accommodated without good reason for a transfer. (*Id.* at 10, 12.) Weinstein denied such requests from Plaintiff on more than one occasion as Plaintiff failed to give him a reason for a move and never reported a specific basis for believing his own cell mate was a threat to his safety.[4] (*Id.* at 19.) Weinstein, however, testified that he had not been personally responsible for Plaintiff's cell placement, and had only dealt with the cell transfer request. (*Id.* at 13.) Weinstein testified that Plaintiff did not ask to be moved based on Plaintiff's transgenderism until after the PREA complaint incident, at which point he believed the request was submitted to the DOC's PREA coordinator, but could not remember the referral specifically as he was not directly involved with it. (*Id.*) Weinstein testified that prior to

---

[4] Weinstein did admit that he at times told Plaintiff that a disciplinary sanction could be levelled if Plaintiff continued to repeatedly make such requests without specifying a specific reason Plaintiff believed his cell mate was a threat as the prison had a policy against repetitious grievances. (*Id.* at 22.) No charges were ever filed on this basis, however. (*Id.*)

this point, he was unaware of Plaintiff's sexuality or gender identity. (*Id.* at 13, 16.) He further testified that he did not mention or discuss Plaintiff's sexuality or identity with other inmates, was unaware that Plaintiff had advocated for policy changes, or had otherwise advocated for other inmates. (*Id.* at 16.)

Weinstein described the PREA incident in August 2019 as follows. He testified that fifteen officers could not have been involved without shutting down other units as there was not sufficient manpower for such an action. (*Id.* at 18.) He then stated that Plaintiff made a sign stating a wish to file a PREA complaint and held it up, at which point Plaintiff's housing officer called the sergeant who went with "a couple guys" to remove Plaintiff from the general cell area for Plaintiff's own safety so he could make a statement to the prison's Special Investigation Unit privately in a holding unit. (*Id.*) Weinstein denied mistreating, harassing, or discriminating against Plaintiff, and that he was uninvolved in the investigation of Plaintiff's PREA complaint. (*Id.*) Weinstein further denied outing Plaintiff or exposing Plaintiff to harassment by other prisoners. (*Id.*) Weinstein denied using any slurs against Plaintiff, transferring Plaintiff because of Plaintiff's sexuality or gender identity, or otherwise retaliating against Plaintiff. (*Id.* at 23.) Weinstein also testified that he was not involved with the decision to move Plaintiff out of South Woods. (*Id.* at 24.)

At his deposition, Defendant Solanik testified that, during the relevant time period, he was the associate administrator of South Woods State Prison. (ECF No. 168-6 at 5.) During that time, he acted as the assistant to Administrator John Powell, and oversaw the operations of the prison, its grievance system, and staff. (*Id.* at 6.) In that capacity, he generally worked in the prison's administration office. (*Id.* at 7.) Solanik denied being the prisons' PREA coordinator, a position

he said was instead filled by Jordan Thomas, one of the facility's assistant superintendents.[5] (*Id.* at 8.) Solanik testified that inmate housing assignments are made following an initial intake classification review which considered the inmates specific needs, issues, and housing limitations. (*Id.* at 7-8.) Such reviews would also take into account the likelihood of intracell violence or sexual abuse/victimization. (*Id.* at 9.) Following the completion of the review, staff would place the inmate in an open bed that met with the inmate's needs and risk factors. (*Id.* at 8.) Cell transfers would thereafter occur where a prisoner made a transfer request which indicated a threat to the inmate's safety, the facility's security, or the like. (*Id.*) The prison's central administration, including Solanik and Powell, however, were rarely involved in these decisions. (*Id.*)

Solanik also testified regarding the prison's PREA-related policies for transgender inmates. He testified that the prison provided transgender inmates with separate individual showering opportunities and, at some point in 2020, adopted a policy of permitting only guards of the gender with which the inmate identified to perform pat searches of transgender inmates. (*Id.*) Solanik testified that housing moves based on transgender status were not made through the prison itself, but usually by a DOC central office committee who considered and oversaw appropriate placements for such inmates. (*Id.* at 10.) Solanik recalled that many of the cell moves for Plaintiff were made by, through, or with this committee after it and PREA coordinator Thomas consulted with Plaintiff. (*Id.*) Solanik, however, was not involved in these decisions, only becoming involved with the physical transfer of Plaintiff to a women's facility when central office

---

[5] Plaintiff's own grievances appear to support this refutation. When in a grievance Plaintiff mentions wishing to discuss PREA compliance related issues in late February 2020, Plaintiff was told that Plaintiff had met with Thomas on this issue recently and would soon be meeting with Thomas to discuss PREA compliance once again. (*See* ECF No. 168-8 at 23.) Plaintiff, during a deposition, also corrected himself to state that the PREA coordinator was not the assistant administrator but instead the superintendent, though he still believed this to be Solanik. (ECF No. 168-3 at 31.) It thus appears that Plaintiff may at least partially have Solanik confused with Thomas.

determined that transfer was warranted. (*Id.* at 10-11.) Solanik further clarified that he was not involved in any specific housing decisions as to Plaintiff, and did not believe he had ever spoken with or met Plaintiff. (*Id.* at 11.) Solanik denied ever knowing or commenting on Plaintiff's sexuality, and stated that he never discussed Plaintiff's identity other than with staff other than as conversations with medical, mental health, and classification committee staff related to the prison's official functions. (*Id.* at 13.) Solanik did recall reading grievances or letters in which Plaintiff identified with or discussed advocating for LGBT related policies, and did recall learning of Plaintiff's transgender status when Plaintiff made reference to it in grievances and other writings to prison staff. (*Id.*at 15.) Solanik did not recall any specific complaints or policy positions advocated for by Plaintiff, but did recall Plaintiff requesting many policy changes. (*Id.*) Solanik also testified that he became aware of Plaintiff filing grievances for other inmates through various SID investigations into Plaintiff's complaints. (*Id.*) Solanik denied ever outing Plaintiff or discussing Plaintiff's identity with any prisoners, and denied ever mistreating or discriminating against Plaintiff for any reason. (*Id.* at 16-17.) Although Solanik did occasionally respond to Plaintiff's grievances, he denied any involvement into Plaintiff's complaints, or any involvement with the SID investigation into the Cream assault incident. (*Id.* at 20-22.)

At his deposition, Defendant Powell testified that he was the administrator of South Woods during the events in question in this matter. (ECF No. 168-7 at 4.) As the administrator, Powell oversaw prison operations and mostly worked in the prison's administration building. (*Id.* at 8.) During his deposition, Powell described initial prison classification and housing placement procedures in line with Solanik's testimony, and stated that he was generally not involved with these decisions and activities. (*Id.* at 9.) Powell testified that although he did not recall who was PREA coordinator during the relevant time period, it would have been one of the prison's assistant superintendents, one of whom was Jordan Thomas. (*Id.* at 10.) Powell testified that, although he

12

had not personally been involved in Plaintiff's prison placements, that the prison's PREA coordinator had referred Plaintiff's housing requests to the NJDOC's central office for consideration, which ultimately led to Plaintiff's transfer to the Edna Mahan facility. (*Id.* at 13.) Powell testified he never discussed Plaintiff, Plaintiff's sexuality, or gender identity with any inmates. (*Id.* at 15.) Indeed, Powell only learned of these issues during the referral of Plaintiff for consideration for a transfer to Edna Mahan, and had been largely unaware of Plaintiff's advocacy activities other than by responding to grievance appeals. (*Id.* at 16-18.)

## II.     **LEGAL STANDARD**

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment, a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

> "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial."

*Serodio*, 27 F. Supp. 3d at 550.

## III.    DISCUSSION[6]

### A.  Plaintiff's Equal Protection and Discrimination claims[7]

Defendants first argue that they are entitled to judgment as a matter of law as to Plaintiff's discrimination claims. Plaintiff's federal discrimination claim is essentially raised under the Equal Protection Clause of the Fourteenth Amendment. Such a claim requires that Plaintiff show that

---

[6] In the brief in opposition to Defendants' summary judgment motions, Plaintiff does not cite a single case in support of his federal claims. Instead, Plaintiff cites only two cases – both cited for the standard applicable to a motion for summary judgment. (*See* ECF No. 174 at 5.) Indeed, the only citation to caselaw related to Plaintiff's claims in the brief is a quote not of applicable law itself, but rather a section of Defendants' own brief. (*Id.* at 16.) Plaintiff's failure to even briefly sketch the caselaw supporting or undergirding all of Plaintiff's claims suggests to the Court that Plaintiff accepts the general contours Defendants have outlined for the nature of Plaintiff's claims.

[7] Plaintiff raises his civil rights claims under both 42 U.S.C. § 1983, the federal civil rights statute, and the NJCRA, its state court analogue which is generally construed identically with a federal civil rights claim and is subject to the same defenses. *See, e.g., Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011). Because the statutes are treated identically absent rare exceptions Plaintiff does not contend apply in this matter, this Court discusses all of Plaintiff's civil rights claims under § 1983 as the same logic, caselaw, and rational would apply to Plaintiff's NJCRA claims.

Plaintiff was "treated differently from other similarly situated [persons], and that this different treatment was the result of intentional discrimination based on his membership in a protected group." *Watlington ex. rel. FCI Schuylkill African Am. Inmates v. Reigel*, 723 F. App'x 137, 139 (3d Cir. 2018).[8] Mere allegations of group based profiling or bigoted views held by prison staff are insufficient to make out an equal protection claim, and the failure to identify a similarly situated person subject to disparate treatment is fatal to such a claim. *Watlington*, 732 F. App'x at 139. Indeed, even the use of slurs, harsh language, or degrading language, standing alone, is generally insufficient to support the finding of a constitutional violation sufficient to support a federal civil rights claim. *See, e.g., Richardson v. Sherrer*, 344 F. App'x 755, 757 (3d Cir. 2009); *Salley v. Pa. Dep't of Corr.*, 181 F. App'x 258, 266 (3d Cir. 2006); *McBride v. Deer*, 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001); *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000); *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999).

Plaintiff's NJLAD claim similarly asserts that Plaintiff was discriminated against by prison staff, which presumably fits within the LAD's prohibition on discrimination in places of public accommodation. *See, e.g., Santiago v. Elchebli*, No. 20-650, 2021 WL 4473179, at *5-6 (D.N.J. Sept. 30, 2021). To prove such a claim, a plaintiff must show that he is a member of a protected class, that the defendants' actions were motivated by discrimination, and that others outside of his protected class did not suffer similar adverse actions. *Id.* Thus, the elements of both Plaintiff's state law and federal civil rights claims are essentially the same.

Defendants do not dispute that Plaintiff was a member of a protected class, but instead argue that Plaintiff has failed to show the remaining elements of Plaintiff's discrimination claims

---

[8] Plaintiff does not appear to assert a class of one theory of liability, under which a plaintiff would need to show that he was treated differently from others similarly situated without a rational basis for this difference. *See, e.g., Wofford v. Lanigan*, No. 14-5723, 2015 WL 9480016, at *5 (D.N.J. Dec. 28, 2015) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 563 (2000)).

– discriminatory purpose/motivation and disparate treatment. As to Defendants Dilks, Powell, Solanik, and Weinstein, Plaintiff's claim arises out of housing assignments and Dilks alleged outing of Plaintiff when he made comments as to Plaintiff's sexuality in the prison library. Although Plaintiff's "outing" claims in the operative complaint reference transgenderism, at the time in question – fall of 2019 – Plaintiff had yet to be formally diagnosed and by Plaintiff's own testimony as to Dilks' comments it appears that at most Dilks surmised Plaintiff to be gay, and Plaintiff was not yet subject to accommodation based on a transgender status Plaintiff had yet to claim before prison staff. Thus, the outing incident appears at most to be a single incident of Dilks using a homophobic slur and language against Plaintiff, which, while deplorable and unacceptable, is insufficient to support a discrimination claim.

In the remains of the discrimination claim against these Defendants, Plaintiff suggests that his prison placements and housing decisions amounted to discriminatory action. Plaintiff references his placement with an alleged Muslim and gang member in the fall of 2019 following the PREA incident. As discussed below, Plaintiff has presented sufficient facts to suggest that Dilks in allegedly suggesting this placement, acted with a retaliatory motive. But to show discrimination under the Equal Protection clause or NJLAD, Plaintiff must do more – he must show a discriminatory motive/purpose and disparate treatment from those similarly situated, which Plaintiff has not done. Even putting aside the testimony of Defendants that they did not know about Plaintiff's background and were largely uninvolved with Plaintiff's placement decisions, Plaintiff has identified no similarly situated individual who was given more beneficial transfers nor that Plaintiff's prison transfers were purposely made, as Plaintiff alleges in the operative complaint, out of discriminatory animus based on Plaintiff's transgederism which was not asserted to prison staff until well after the fall 2019 prison placement. Indeed, the record suggests that Plaintiff was provided with numerous cell moves after this incident, that as soon as Plaintiff asked

to be housed based on Plaintiff's gender in February 2020, Plaintiff was offered a move to Edna Mahan which Plaintiff rejected, that Plaintiff was moved from a unit he liked only after the other inmates in the unit protested Plaintiff's presence, and that when Plaintiff filed grievances asserting feeling unsafe, he was either seen by staff or told to submit reasons why he felt his housing unsafe, and that Plaintiff's failure to adequately concretize Plaintiff's feeling unsafe with actual factual reasoning for a transfer that Plaintiff's requests were not acted upon.  Plaintiff has likewise not identified a similarly situated individual who was not homosexual or transgender who received more beneficial transfer or who was granted transfer or cell mate requests without similarly having to supply good reason to prison staff for a transfer.  Thus, while Plaintiff's treatment may not have been ideal, and Dilks' alleged language is certainly not acceptable, Plaintiff's failure to show that the challenged placement decisions were made with a discriminatory motive or purpose and that others similarly situated were treated differently in relation to housing/transfer decisions entitles Defendants Dilks, Weinstein, Powell, and Solanik to summary judgment on these claims.

Defendant Young also moves for summary judgment on this claim.  As Young argues, Plaintiff has failed to produce facts indicating that Young's actions against Plaintiff – discussed below in relation to Plaintiff's retaliation claims – were animated by a discriminatory purpose. Indeed, Plaintiff's own deposition testimony appears to describe Young as curious regarding Plaintiff's transgenderism, and Plaintiff clearly testified that the animus Young had towards him only arose when she was told that Plaintiff had filed grievances against her.  Plaintiff's own testimony thus paints Young's alleged animus as *retaliatory* and not *discriminatory.*  Plaintiff directly described her as otherwise "cool" and that they had not had any issues before Young allegedly learned of Plaintiff's grievance filings.  It is thus clear that Young is entitled to summary judgment as to Plaintiff's equal protection and discrimination claims.

### B. Plaintiff's First Amendment retaliation claims

Defendants next argue that they are entitled to judgment as a matter of law as to Plaintiff's First Amendment retaliation claims.  To make out a First Amendment retaliation claims, a Plaintiff must plead facts showing that he engaged in constitutionally protected conduct, that Defendants engaged in retaliatory action sufficient to deter a person of reasonable firmness from exercising his constitutional rights, and a causal link between the protected activities and the retaliatory action.  *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).  Plaintiff contends that Plaintiff suffered various retaliatory transfers, an overly oppressive response to Plaintiff's request to make a PREA complaint, and refusals to transfer Plaintiff in response to his engaging in LGBT advocacy and helping other inmates to file grievances.  Problematically, Plaintiff lays the blame for much of these events on Plaintiff's engaging in advocacy for policy changes after a friend died in December 2019, even though the most egregious events other than the Cream assault universally predate that event's occurrence.  Indeed, the event which apparently most affected Plaintiff – the outing and subsequent PREA incident, happened in August 2019, long before that point where Plaintiff's alleged policy activism began.  Indeed, the alleged outing by Dilks is not clearly connected to advocacy; Plaintiff's own testimony instead suggests it was the result of animus or bigotry on the part of Dilks.  Plaintiff's testimony thus does not establish a proper causal connection to support a retaliation claim related to that initial outing.

Things are more complicated as to the PREA incident.  Although Plaintiff makes much of the alleged number of involved guards, the actual move to a holding cell was apparently standard prison procedure for making a PREA complaint, and Plaintiff's testimony does not actually clearly put any of the named Defendants into direct involvement of Plaintiff's interactions with the actions of the officers who moved Plaintiff into the holding cell.

After the placement in the holding cell, however, Plaintiff does allege facts which, if found credible by the jury, could support the inference that Dilks did have a retaliatory motive and acted upon that motive – specifically Plaintiff's testimony implies that Dilks came to speak with Plaintiff and suggest that he not continue with Plaintiff's PREA complaint following the outing incident and thereafter allegedly purposely had Plaintiff moved into a cell with an inmate who would find Plaintiff's lifestyle distasteful. Giving Plaintiff the benefit of all reasonable inferences, a jury could potentially find that Dilks was responsible for Plaintiff's five hour placement in a holding cell without the ability to use the bathroom, that, after making Plaintiff spend several hours in this condition Dilks entered and used that experience to dissuade Plaintiff from continuing with his PREA complaint, and when Plaintiff would not be dissuaded allegedly took action to move Plaintiff to a cell with an inmate who would not appreciate Plaintiff's proclivities, all of which would support both the conclusion that Dilks took retaliatory action sufficient to dissuade a person of ordinary firmness from engaging in further complaints, and that this was directly causally connected to Plaintiff wanting to file a complaint against Dilks. Thus, if a jury found Plaintiff's version of events credible, a jury could find that Dilks retaliated against Plaintiff for making complaints, and thus Dilks is not entitled to summary judgment as to Plaintiff's retaliation claim.[9]

---

[9] Defendant Dilks does argue that he is entitled to qualified immunity as to all of Plaintiff's claims, but does not provide explicit argument to support the idea that Plaintiff both failed to provide facts to support the finding of a constitutional violation or that such a violation is not clearly established. To show an entitlement to qualified immunity for this claim, Dilks would have to show either that Plaintiff has failed to set out a constitutional violation or that the violation in question was not clearly established by Supreme Court or a body of persuasive circuit court precedent at the time of the events in question. *See, e.g., Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637-38 (3d Cir. 2015). As discussed above, Plaintiff clearly has provided facts enough to support a First Amendment retaliation claim against Dilks. Dilks does not, in his briefing, directly addressed the clearly established prong of the qualified immunity analysis as to Plaintiff's retaliation claims sufficient to show his entitlement to qualified immunity on that basis. Even had Dilks adequately addressed the issue, the Third Circuit has held previously that it has been clearly established that an officer may be held liable for engaging in punitive cell transfers and other retaliatory or embarrassing conduct in reaction to filing grievances and suits. *See, e.g., Mack v. Warden Loretto*

Turning to Weinstein, Powell, and Solanik, Plaintiff fails to set forth facts sufficient to support a retaliation claim. Although Plaintiff alleges that Weinstein had some hand in his placement in a cell with a Muslim inmate who was also a gang member who was unlikely to appreciate Plaintiff's lifestyle and advocacy interests, Plaintiff does not provide facts to support that Weinstein was involved in any transfer as a response to a grievance or complaint, but rather suggests that Weinstein, to the extent he was involved, transferred Plaintiff because a transfer was necessary following the theatrics of Plaintiff's efforts to file a PREA complaint. Plaintiff does not provide sufficient facts to support the conclusion that Weinstein was acting with a retaliatory motive, nor that he took actions which were truly retaliatory in nature. Plaintiff's testimony instead appears to support a conclusion that Dilks took advantage of the transfer to suggest Plaintiff be put into the cell in question after Plaintiff failed to "get the hint" and cease his complaint when Dilks suggested Plaintiff do so. Plaintiff likewise fails to show that Powell or Solanik were involved in this decision, or that they had any retaliatory motive or purpose to the extent. Plaintiff does not allege facts showing Solanik or Powell sought to punish Plaintiff for any grievance filings, nor that they had him placed in any specific cell to dissuade further advocacy. As Plaintiff has failed to provide facts which would support retaliatory conduct or a causal connection to protected activity as to Weinstein, Solanik, or Powell, those three Defendants are entitled to summary judgment as to Plaintiff's retaliation claims.

Turning to Defendant Young, Plaintiff's testimony was that someone "lied to her" that Plaintiff wrote a grievance about her, and that "she said to [Plaintiff] . . . when I come back this

---

*FCI*, 839 F.3d 286, 300-01 (3d Cir. 2016); *Atkinson v. Taylor*, 316 F.3d 257, 269-70 (3d Cir. 2003). In the absence of clear argument on Dilks' part to show that the right in question – a prisoner's right not to be subjected to abuse and retaliatory prison transfers in response to submitting formal complaints and grievances - was not clearly established, and in light of caselaw clearly suggesting that right was clearly established before the fall of 2019, this Court cannot find that Dilks is entitled to qualified immunity as to this claim at this time.

[expletive] better not be here or I'm going to search the entire unit or I'm going to F up all the rooms or something to that extent." Although Plaintiff says that Plaintiff did write a grievance about her eventually, it is not clear that Plaintiff did so before this comment was made. Plaintiff repeatedly says that Plaintiff had no issue with her before this point, and that the statement that Plaintiff had written against her was a lie, but Plaintiff also says that Plaintiff "did write her up for what she did" and suggests that Plaintiff had written about her and she should not have known about it. This testimony makes it difficult to say whether this comment was made in response to Plaintiff actually engaging in protected conduct, or merely Young's belief that Plaintiff had done so. Plaintiff also did not state in the deposition to whom other than Plaintiff this statement was made, but implies that the statement was made generally to other inmates. Giving Plaintiff the benefit of all reasonable inferences, it appears that Plaintiff's claim is that Young learned of grievances Plaintiff filed, and then made statements in the presence of other inmates to instigate an attack upon him. Such an action would be sufficient to deter a person of ordinary firmness and would be sufficient to support a claim for retaliation if a jury found it credible. Indeed, it is possible that a jury might find that this statement was the source of the Cream incident. Young is therefore not entitled to summary judgment as to this portion of Plaintiff's retaliation claim.[10]

In Plaintiff's remaining retaliation claim, Plaintiff contends that Young put the Cream attack into motion, called to have his cell door open, and otherwise aided and abetted the attack to punish Plaintiff for filing grievances. As is discussed in detail in relation to Plaintiff's Eighth

---

[10] Young does raise an argument as to qualified immunity in her motion for summary judgment, but does not address that argument to the claim related to the incitement comment, and instead only argues qualified immunity as to the Cream incident itself and Young's actions in overseeing that recreation period. As Young has not directly argued an entitlement to qualified immunity related to the incitement comment and its implications towards the later Cream event, Young's arguments on that point do not apply to this part of the retaliation claim. To the extent that Young only mistakenly failed to raise qualified immunity as to this earlier conflict and event, Young may file a second summary judgment motion within thirty days raising that argument.

Amendment claim against Young below, however, Plaintiff's testimony in this regard – that Young signaled Cream to go after Plaintiff and attack Plaintiff, that she then called to have his cell door unlocked, and the like – are directly contradicted by video evidence.  Thus, to the extent Plaintiff has a retaliation claim premised solely on Young's actions during the attack – Plaintiff's testimony that she facilitated it by calling to have his cell door opened, for example – that claim is contradicted by the evidence and Young is entitled to judgment as to that portion of Plaintiff's retaliation claim.

### C.  Plaintiff's Eighth Amendment claims

In Plaintiff's Eighth Amendment claims against Defendants Powell, Solanik, Dilks, and Weinstein, Plaintiff contends that they placed Plaintiff in potentially dangerous cell assignments and refused to transfer Plaintiff upon Plaintiff's numerous requests.  To succeed on such a claim, Plaintiff would need to show at least that these Defendants, in so doing, were deliberately indifferent to an excessive risk to Plaintiff's health or safety.  *See Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir. 2014).  Generally, the risk that an inmate, even one with a history of violence, may attack another inmate for an unknown reason is insufficient to meet this requirement.  *Id.*  In this matter, Plaintiff does not provide any direct evidence that Defendants knew or should have known that any of Plaintiff's specific cell placings were a significant threat to Plaintiff's health or safety.  Although Plaintiff testified that he was placed with a Muslim inmate who was a gang member, Plaintiff does not allege any known animosity between the two of them, nor does Plaintiff allege any direct threats or violence from this other individual prior to Plaintiff's placement in a cell with him.  Plaintiff likewise does not assert or provide facts that there was some known fact about the inmate, such as a history of sexual or homophobic violence, which would show that a

placement with this individual would itself amount to deliberate indifference to an excessive risk to Plaintiff's health or safety.[11]

Likewise, although Plaintiff provides various allegations of feeling unsafe in many of the several cells to which Plaintiff was thereafter transferred, and that Plaintiff felt staff did not adequately consider Plaintiff's feelings in making cell assignments, Plaintiff fails to show that any of these assignments or changes amounted to exposing Plaintiff to a known risk of danger. Indeed, Defendants' responses to Plaintiff's transfer related grievances show that he was repeatedly asked to provide reasons for believing that he was in danger, and Plaintiff failed to provide any such information or direct allegations of a threat in response to those requests for more information. That the facility and its staff refused to transfer Plaintiff at whim, and required Plaintiff to provide reasons for believing his safety at risk before transferring Plaintiff to different cells, and that Defendants refused Plaintiff's request to be able to specifically choose his cell mate does not amount to deliberate indifference sufficient to support a claim under the Eighth Amendment. *Id.* The record, including Plaintiff's own testimony, indicates that Plaintiff was transferred multiple times over the course of 2019 and 2020, including when others in his cell block showed animosity towards Plaintiff's presence and protested Plaintiff being in their unit, that Plaintiff did not provide specific complaints of danger to warrant further transfers, and that Plaintiff was even offered transfer to a woman's prison as early as the spring of 2020 and decided against such a move. In light of these facts, and the lack of evidence to support the contention that Plaintiff gave

---

[11] Although Plaintiff did testify that he was attacked and at least at times suggested that it was this individual who attacked him in that first incident, it does not appear that this event was ever communicated to the actual Defendants in this matter. Likewise, in his grievances and complaints and requests for transfer, this alleged assault was never mentioned. Indeed, in September 2019, shortly after being housed with this inmate, Plaintiff apparently told medical staff he felt safe in that cell assignment. (ECF No. 168-8 at 12.) Thus, even assuming that the alleged assault did take place, Plaintiff has failed to provide a factual basis for attributing any continued danger after that assault to Defendants' deliberate indifference.

Defendants good reason to know that he was faced with an excessive risk of danger without further transfers, Plaintiff has failed to show deliberate indifference in relation to the cell transfers and placements. Defendants Powell, Solanik, Dilks, and Weinstein are thus entitled to judgment as to Plaintiff's Eighth Amendment claims. *Id.*

As to Defendant Young, Plaintiff argues that she is liable to him under the Eighth Amendment for allegedly permitting or otherwise aiding an inmate to attack Plaintiff in his cell in the Cream incident. Indeed, the version of this claim contained in Plaintiff's operative complaint is expressly based on the allegation that Young herself called to have Plaintiff's cell door opened to permit Cream into Plaintiff's cell. Plaintiff's Eighth Amendment claim against Young therefore essentially boils down to a failure to protect claim. In order to make out such a claim, Plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the named Defendants were "deliberately indifferent" to that risk, resulting in harm to the Plaintiff. *Belt v. Fed. Bureau of Prisons*, 336 F. Supp. 3d 428, 438-39 (D.N.J. 2018); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012). An officer will only be deliberately indifferent where he knew of and disregarded a known risk of serious harm. *Belt*, 336 F.3d at 438. One subspecies of failure to protect claim involves an officer's failure to intervene to stop or prevent an assault on an inmate by another inmate. Under such a theory of liability, the plaintiff must show that the officer in question was aware of the danger, had a "realistic and reasonable opportunity to intervene" in to stop an attack upon the plaintiff and "simply refused to do so," resulting in harm to the plaintiff. *Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012); *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002).

Here, the video evidence clearly shows that, throughout the entire interaction between Plaintiff and Cream, Young remained on the first floor of the prison unit, seated, watching over Plaintiff's unit's recreation activities a good distance from Plaintiff's cell. Indeed, from the video,

24

it appears that it would be very difficult indeed to see which cell Plaintiff or Cream entered on the second floor, and nearly impossible to see what occurred within a cell. The video also indicates that at no time during these events did Young rise, use a phone, or otherwise indicate that Plaintiff's cell door should be opened for Cream. At most, the video shows that Young saw Cream go up the stairs and did not actively stop him from going to the second floor. Beyond that point, an officer in Young's position would have great difficulty seeing exactly which cell Cream walked to, and could not see what happened once Cream entered a cell. As the video evidence clearly undercuts Plaintiff's testimony that Young had the cell door opened, motioned to or otherwise signaled Cream, or otherwise acted to join or facilitate the attack, and as the video evidence indicates that Young could not see that Cream was assaulting or otherwise harming Plaintiff, the facts in the record do not permit the inference that Young was aware of the threat to Plaintiff. That Cream went up the stairs may amount to negligence on Young's part – a failure to perform her duties and properly control inmate flow during recreation time – but negligence is not sufficient to make out an Eighth Amendment claim. The record, which contradicts Plaintiff's version of the facts, does not permit the inference that she knew Cream was going to assault Plaintiff, that she knew that Cream posed a threat to Plaintiff, or that she had any ability to observe or intervene to stop the brief fight between Cream and Plaintiff. As the facts do not permit a reasonable inference that Young was deliberately indifferent to Cream's threat to Plaintiff as there is nothing other than Plaintiff's contradicted testimony to support the conclusion that Young knew of and failed to prevent the threat posed by Cream, Young is entitled to judgment as a matter of law as to Plaintiff's Eighth Amendment claim against her as to the Cream assault incident.

## IV.    <u>**CONCLUSION**</u>

In conclusion, Defendants' motions for summary judgment (ECF Nos. 167-68) are

**GRANTED IN PART** and **DENIED IN PART**.  An appropriate order follows.

Hon. Karen M. Williams,
United States District Judge